[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 31, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-14805
Non-Argument Calendar

_____

D. C. Docket No. 04-03302-CV-2-IPJ

FRANK E. MCNAMEE,

Plaintiff-Appellant,

versus

SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(January 31, 2006)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Plaintiff-appellant Frank McNamee appeals the district court's order

affirming the denial by the Commissioner of Social Security ("Commissioner") of his applications for disability benefits, pursuant to 42 U.S.C. § 405(g), and supplemental security income, pursuant to 42 U.S.C. § 1383(c)(3). Because the administrative law judge ("ALJ") gave specific reasons for according what weight he gave to various parts of the record, and because he based his decision on substantial medical evidence, we AFFIRM.

## I. BACKGROUND

McNamee applied for disability insurance benefits and supplemental security income on 18 December 2001, on the ground that he was disabled as of 1 April 1996[1] due to heart attack and disease. R2 at 47, 265. The applications were denied both initially and upon reconsideration by an ALJ. McNamee requested an Appeals Council review. The Appeals Council concluded that no basis existed upon which to review the ALJ's decision, thus leaving it to stand as the Commissioner's final decision. McNamee then appealed to the district court, which upheld the ALJ's decision as having been based upon substantial evidence.

The record before the ALJ, apart from the applications, disability reports, and activities questionaires completed and submitted by McNamee and his wife,

---

[1]McNamee's applications, in expressing uncertainty as to the exact year, and the transcript from the hearing before the ALJ all indicate that the onset of alleged disability may actually have been 1 April 1997, the onset of the first heart attack. See R2 at 47, 265, 284.

included a variety of medical records covering the period April 1997 through November 2003. The records from his April 1997 hospitalization at Cooper Green Hospital and University of Alabama, Birmingham Medical Center report his condition at discharge after by-pass surgery as "[d]ramatically improved." Id. at 133. Emergency room and follow-up records covering the period from 22 June 1997 to 6 April 1998 from Cooper Green Hospital, id. at 137-149, report an infection at the incision site which was treated with antibiotics. See id. at 137. The records from his December 2001 hospitalization at Bessemer Carraway Medical Center in connection with a stroke indicate that he was in stable condition at discharge and had been instructed to discontinue smoking and minimize alcohol intake. Id. at 151. A consultative psychological evaluation based on a 21 March 2002 clinical interview by Dr. John Neville reports that McNamee admitted to being able to "bathe, dress and feed himself," and to "doing some housework." Id. at 179. Dr. Neville concluded that McNamee was mentally capable of functioning independently, that he was able to understand and carry out instructions, and that he appeared able to cope with ordinary work pressures. Id. at 181. A consultative medical evaluation based on a 25 March 2002 physical examination by Dr. Lillian Klancar in which McNamee complained of bilateral hip pain, reported that McNamee was "able to do dusting, sweeping, and cooking," that he "care[d] for a

small garden and [could] do planting." Id. at 189. Dr. Klancar also reported that McNamee reported difficulty mowing because of his hip pain but was not limited by any heart symptoms. Id. She observed that there were, at that point, "no limitations in standing, walking, lifting, carrying, sitting, or manipulation . . . [and that McNamee] ha[d] no postural or other limitations." Id. at 191. The record indicates that McNamee was admitted to University of Alabama at Birmingham Medical Center West in connection with a second stroke in May 2002 at which time his "chief complaint" was that he was unable to see. Id. at 195. In the course of a consultative visual examination performed on 16 September 2002, Dr. James Kelly found that, following the May 2002 stroke, McNamee retained 20/20 uncorrected distance vision in each eye, 20/30 corrected close vision in the right eye, and 20/25 corrected close vision in the left eye. Id. at 233. Dr. Kelly also observed that, although McNamee suffered a restricted visual field, he retained binocular vision in all directions, and his depth and color perception were normal. Id. at 233-34. Dr. Kelly accordingly concluded that, although McNamee should not operate machinery in light of his visual field defect, he could "get around the room alright" and "he might be able to learn to drive if he is a very careful person." Id. at 238.

During the hearing, the ALJ also admitted into the record an internal

4

medicine examination, physical capacities evaluation, clinical assessment of pain, and clinical assessment of fatigue and weakness completed by Dr. J. L Zaremba on 20 November 2003. Dr. Zaremba's history notes reported that McNamee had suffered three strokes, that he had difficulty walking especially up hill, and that he used a cane on occasion for steadiness. Id. at 241. Dr. Zaremba reported observing that McNamee's lungs were clear, that his heart rate and rhythm were "regular . . . without gallop, murmur or rub," that he had "no clubbing, cyanosis or edema," that he had "full" range of motion, and that his gait was somewhat slow and steady but that he could "ambulate without a cane." Id. at 243. Dr. Zaremba also noted that McNamee suffered no spasms or deformity of his back and complained only of mild pain, that a heel/toe walk was difficult for him but that station was normal, and finally, that neurologically McNamee had "grossly intact" motor skills, apparently intact sensory perception, equal reflexes, 5/5 grip, and no atrophy. Id. In assessing McNamee's physical capabilities, Dr. Zaremba suggested that he could be expected to lift ten pounds occasionally or less frequently, that he could sit for six hours and stand for one hour of any eight hour workday, and that he might occasionally need a cane for balance. Id. at 245. Based on these observations, he concluded that McNamee should never do pushing or pulling movements, operate motor vehicles, work around hazardous machinery,

dust or allergens, that he would be unsteady climbing stairs, and that he could occasionally grasp, twist, bend and stoop, and that he would have no trouble with fine manipulation or reaching. Id. Finally, progress notes from the period covering 16 June to 29 August 2003 from the VA Medical Center in Birmingham indicate that McNamee had no ankle edema, regular heart rate and pulse, clear lungs, no muscle tenderness or proximal weakness and, apart from an abdominal hernia and continued smoking, appeared to be "doing fairly well." Id. at 260.

Finally, at the hearing, McNamee testified that he currently worked at a flea market as a dealer (four to five days a month), that he had also worked there as a short order cook within the last few years, and that he had worked there the previous year as a security guard (two or three days a week for up to nine hours a day) and still filled in when they needed someone. Id. at 281-84. The ALJ asked a vocational expert, Claude Peacock, the following hypothetical question:

> [W]e have a hypothetical person who could occasionally lift and carry 20 pounds, and frequently lift and carry ten pounds, could stand and walk for up to six hours in an eight-hour day, and sit for up to six hours in an eight-hour day, is unable to work around unprotected heights, no dangerous or moving equipment, no ladders, ropes, or scaffolds. This hypothetical person should not drive. Can frequently balance and frequently climb ramps and stairs, occasionally stoop, kneel, and crouch, needs to avoid concentrated exposure to extreme heat, cold, or humidity. . . . has a restricted field of vision . . . [a]nd . . . should not use firearms. . . . [C]ould this . . . person return to any of the past work as it was performed by Mr. McNamee, or as that work is normally performed in the national economy?

6

Id. at 299-300. Peacock responded that the hypothetical person could not return to any of his past work, but could do "light work" activity such as hotel or motel housekeeping or working as a security guard or gate keeper. Id. at 300. Peacock also confirmed that such positions were available in north central Alabama. Id.

On the basis of the record and the hearing, the ALJ found that McNamee "ha[d] 'severe' impairments, including ischemic heart disease, status post by-pass surgery, status post cerebrovasular accident times 2, and diminished vision field." Id. at 25. The ALJ also found that these "impairments, considered individually or in combination d[id] not meet or medically equal, in severity, any impairment listed" in the relevant regulations, and furthermore, that they would not prevent McNamee from performing a significant range of light work, thereby leaving him ineligible for disability benefits. See id. at 26.

In coming to this conclusion, the ALJ explained that he had accorded "[s]ignificant weight . . . to the findings and opinions of both Dr. Neville and Dr. Klancar" each of whom personally examined McNamee. Id. at 23. The ALJ also accorded significant weight to the opinion of Dr. Kelly regarding any increased visual impairment due to McNamee's May 2002 stroke. Id. The ALJ further explained that he accorded no weight to the opinion of Dr. Zaremba, whose "assessment was based upon his one-time examination of [McNamee] based upon

7

[his lawyer's] referral and review of 'enclosed medical information' submitted by [his lawyer],"[2] because he found (1) the history McNamee gave Dr. Zaremba not to be supported by the record; (2) the conclusions reached by Dr. Zaremba regarding the severity of McNamee's impairment not to be supported by the medical evidence of record; and (3) Dr. Zaremba's reported findings to be inconsistent with his own assessment of McNamee's functional capabilities.  Id. at 23.

On appeal, McNamee argues that the ALJ erred by rejecting the opinion of Dr. Zaremba because he was an evaluative physician.

## II. DISCUSSION

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based on proper legal standards."  Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158  (11th Cir. 2004) (per curiam) (citation omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Id. at 1158 (citation omitted).  "Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence."  Id. at 1158-59 (citation omitted).

Social security regulations require an ALJ evaluating medical opinion

---

[2]The ALJ also observed that the record did not clarify exactly what medical information was submitted to Dr. Zaremba for the purposes of this examination.

evidence to consider a variety of factors, including the examining and treatment relationships, the specialization of the person giving the opinion, and how well the record supports the opinion in question. See 20 C.F.R. § 404.1527(d)(1)-(6). Generally, the opinions of examining physicians are given more weight than those of non-examining physicians, treating physicians are given more weight than those of physicians who examine but do not treat, and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists. See § 404.1527(d)(1), (2) & (5). "It is well-established that 'the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" Crawford, 363 F.3d at 1159 (quoting Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997)). "A treating physician's report 'may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.'" Id. (quoting Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991) where such good cause was found to exist because the opinion was contradicted by other notations in the physician's own record). Finally, "[i]n assessing the medical evidence . . . the ALJ [is] required to state with particularity the weight [given] the different medical opinions and the reasons therefor." Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam).

First, with respect to McNamee, Dr. Zaremba was not a treating physician, but only examined McNamee for the purpose of a consultative evaluation. Accordingly, his opinion is not entitled to the substantial weight due the opinion of a treating physician. Second, although McNamee asserts that Dr. Klancar's opinion should not have weighed more heavily than Dr. Zaremba's because it did not reflect the severe limitations McNamee experienced after his second stroke whereas Dr. Zaremba's did, the ALJ had additional and updated medical evidence both from Dr. Kelly and from the VA Medical Center. We find that this evidence was adequate to allow the ALJ to make a determination based on substantial evidence. Third, McNamee's argument that the ALJ erred in finding that Dr. Zaremba's opinion regarding McNamee's functional limitations was inconsistent with Zaremba's reported observations fails because the ALJ clearly stated reasons, grounded in the record, as to why he found Dr. Zaremba's opinion inconsistent with that doctor's own findings.

In his findings, the ALJ noted that Dr. Zaremba's physical assessment revealed (1) no abnormalities in the heart and lungs; (2) no evidence of clubbing, cyanosis, or edema in any extremity; (3) full range of motion despite some complaints of pain; (4) an ability to walk without a cane; and (5) that heel/toe walk was difficult, but that station was normal. See R2 at 23. All of this is inconsistent

with Dr. Zaremba's assessment of McNamee's functional limitations. In explaining his reasons for disregarding Dr. Zaremba's opinion, the ALJ also pointed out that the history section of Dr. Zaremba's report, particularly in its report of three rather than two strokes, was unsubstantiated by the record and that it was unclear exactly what records had been submitted to Dr. Zaremba for review prior to the examination. Because the ALJ gave specific reasons for according no weight to Dr. Zaremba's opinion, and because the ALJ based his decision on substantial medical evidence, we find no reversible error.

## III. CONCLUSION

McNamee appeals the district court's order affirming the denial by the Commissioner of his applications for disability benefits and supplemental security income. The ALJ gave specific reasons for according what weight he did to various parts of the record, and based his decision on substantial medical evidence. Accordingly, we **AFFIRM** the district court's decision.